UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
UNITED STATES OF AMERICA,

            Plaintiff,

       - against -

JUAN RIJO-CARRION,

            Defendant.
----------------------------------------------------------------X

MEMORANDUM AND ORDER
11-CR-784(RRM)

ROSLYNN R. MAUSKOPF, United States District Judge.

     Defendant Juan Rijo-Carrion moves pursuant to Federal Rule of Criminal Procedure 12(b)(3) to suppress certain statements he made on October 21, 2011 at John F. Kennedy International Airport ("JFK") both during a border inspection during which drugs were found in defendant's suitcase, and subsequent to defendant's arrest. (Def.'s Mot. to Suppress (Doc. No. 12).) The Court held a suppression hearing, limited to the issue of whether defendant knowingly and voluntarily waived his *Miranda* rights, at which Customs and Border Protection ("CBP") Officer Moses Sanchez testified as the sole witness. For the reasons below, defendant's motion is denied in its entirety.

## FINDINGS OF FACT

     The facts below are taken from the government's sworn complaint (Doc. No. 1), the affidavits of defendant and defense counsel in support of the motion to suppress (Doc. No. 13-A),[1] and the testimony of Officer Sanchez at the suppression hearing, which the Court finds credible in its entirety.

---

[1] Counsel's affidavit is not based on personal knowledge and thus would not be admissible on this motion. *United States v. Gillette*, 383 F.2d 843, 848 (2d. Cir. 1967). This defect notwithstanding, even relying on those facts and taking them as true would not help establish custody for purposes of *Miranda*. *See infra*.

Defendant arrived at JFK on October 21, 2011 aboard Jet Blue flight # 832 from the Dominican Republic. (Compl. at ¶ 1.) Defendant was selected for a secondary customs inspection, and was escorted by a uniformed agent to step out of line to a separate screening area.[2] (Compl. at ¶ 2; Def.'s Aff. at ¶ 3–4.) Defendant presented a particular red suitcase and admitted the suitcase belonged to him. (Compl. at ¶ 2.) Defendant was also in possession of the claim check ticket that matched the tag number on the suitcase. (*Id.*) The suitcase was later determined to contain a substance that field-tested positive for the presence of cocaine. (*Id.*) Defendant was then placed under arrest. (*Id.*)

Officer Sanchez was directed by his supervisor to proceed to a search room to assist agents of the Department of Homeland Security and to act as an interpreter. (Def.'s Aff. at ¶ 9; Tr. at 22:9–11.) Officer Sanchez testified that he is a fluent Spanish speaker, speaking it at home from the time he was a young child. (Tr. at 10:13–21.) Having attained the highest level on an exam administered as part of the Foreign Assessment Proficiency program, Sanchez is authorized to use the language as part of his work as a CBP officer for which he receives a monetary bonus. (Tr. at 10:22–25; 11:1–13.) Sanchez estimated that he uses Spanish daily in approximately 10% of his work, and has given *Miranda* warnings in Spanish four or five times a year, for the roughly four years he has been a Customs and Border Protection Officer. (Tr. at 11:14-16; 14:14-16; 28:14-25; 29:1-3.)

---

[2] Is it not clear from the evidence presented whether the secondary screening took place in a public area adjacent to the main customs line, or in a separate enclosed room. Defendant's affidavit describes the location of the secondary screening by stating: "a uniformed ICE agent directed me to step out of the line to a *separate secured area* for a secondary interrogation." (Def.'s Aff. at ¶ 3 (emphasis added).) The affidavit of defendant's counsel describes the location both as a "separate secured area" and a "separate secondary inspection area." (Def.'s Mot. to Suppress at ¶¶ 5, 6.) Defendant's memorandum of law in support of his motion to dismiss, however, states that the questioning took place in a separate room: "defendant complied with a direct order…to step out of the general customs line…and to report to a separate room. As he reported to the segregated secondary inspection room, he was accompanied by a uniformed CPB officer." (*Id.* at 4–5.) Even assuming the secondary inspection took place in a private, secured screening room, this Court finds as discussed more fully below that under the totality of the circumstances surrounding the seconding screening, defendant was not in custody for *Miranda* purposes.

Upon arriving at the search room, Sanchez met with Homeland Security agents who briefed him on the circumstances of defendant's arrest. (TR at 21:2-8). He then met the defendant, introduced himself in Spanish, made small talk, and asked defendant whether defendant could understand him. (Tr. at 33:16–19.) Defendant indicated that he did understand. (Tr. at 33:19–20.)

Officer Sanchez testified that he then read each of the *Miranda* warnings to defendant in Spanish from a Spanish-language *Miranda* card. (Tr. at 6:2–3, 7:20–22, 8:15–25.) Officer Sanchez testified that he read directly from the Spanish-language portion of the card, rather than translating the English warnings into Spanish.[3] (Tr. at 39:4–7.)

Based on his experience screening passengers from a number of Spanish-speaking countries, Officer Sanchez believed that certain passengers, particularly those from the Dominican Republic, might have trouble understanding the word "waive" in Spanish as it would be read directly from the *Miranda* card. (Tr. at 42:7–12.) As a result, and believing that the defendant was Dominican, Officer Sanchez further explained the meaning of waiving one's rights after reading the final warning directly from the *Miranda* card in Spanish, but before defendant responded. (Tr. at 45:16–25, 46:1–13.) Although Officer Sanchez indicated that he did not recall the specific words he used (Tr. at 46:10–13), he testified as follows:

> At that point I said, with [sic] that last question meant is you realize you have the right not to say anything—I'm sorry, you have the right to forego or to let go of all of these rights and then make a statement, or you have a right to just stay there and be quiet and not say anything.

(Tr. at 45:19–24.)

Officer Sanchez testified that defendant said he understood his rights and that he was willing to speak to the officers. (Tr. at 10:7−10; 46:11–13.) Officer Sanchez did not recall

---

[3] The government introduced into evidence a copy of the *Miranda* card used by Officer Sanchez. (Gov. Ex. 1; Tr. at 7:4–8.)

presenting defendant with a written *Miranda* waiver form, and there is no evidence that defendant ever read or signed a waiver form. (Tr. at 31:20–25, 32:1.) Defendant orally indicated that he was willing to waive his rights and speak to police. (Tr. at 10:7–10.) Officer Sanchez testified that the entire interview lasted approximately 45 minutes to an hour. (Tr. at 27:22–25.)

Officer Sanchez asked defendant whether defendant understood his Spanish a total of three or four times. (Tr. at 12:2–8, 32:2–9.) Each time, defendant indicated that he understood. (Tr. at 12:19–22.) Officer Sanchez testified that defendant never indicated that he did not understand his rights or that he was confused about anything Officer Sanchez had said to him (Tr. at 11:21–23;12:16–18), never had a puzzled expression on his face, and never otherwise indicated that he did not understand what Sanchez was saying (Tr. at 42:13–22).

Defendant offered no testimony at the hearing, but stated in his affidavit that the officers "attempted to administer *Miranda* warnings without the assistance of a certified [S]panish interpreter," that he speaks "no English," and that he "did not understand the nature of these warnings." (Def.'s Aff. at ¶¶ 8–10.)

## CONCLUSIONS OF LAW

I. Statements Upon Entry to the United States

Defendant first moves to suppress the statements made at the border upon entry to the United States, in which he admitted ownership of the suitcase containing drugs, on the ground that he was in custody for purposes of *Miranda*. The government argues that these circumstances − a routine secondary inspection at the border − did not constitute custodial interrogation. The Court agrees with the government.

A suspect is in custody for purposes of *Miranda* if a reasonable person in the suspect's position would feel "subject to restraints comparable to those associated with formal arrest."

4

*Georgison v. Donelli*, 588 F.3d 145, 155 (2d Cir. 2009) (quoting *Berkemer v. McCarty,* 468 U.S. 420, 441(1984)). The inquiry is objective, and must take into account the totality of the circumstances surrounding the encounter, and include "the interrogation's duration; its location, (e.g. at the suspect's home, in public, in a police station, or at the border); whether the subject volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; whether officers told the suspect he was free to leave or under suspicion; . . . and especially so in border situations, the nature of the questions asked." *United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011) (quoting *Georgison*, 588 F.3d at 155.)

Even where a suspect might not be free to leave, such as in a traffic stop, the suspect is not necessarily in custody for purposes of *Miranda*. *FNU LNU*, 653 F.3d at 153. This is particularly true in the border context:

> [I]n the context of arriving at an American airport (a) in which compulsory questioning – with no freedom to enter the United States and with nowhere else to go – inheres in the situation and (b) in which the traveler has voluntarily submitted to some degree of confinement and restraint by approaching the border, a reasonable traveler will expect some constraints as well as questions and follow-up about his or her citizenship, authorization to enter the country, destination, baggage and so on.

*Id*. at 153-54. "That one expects both constraints and questions – and that, at least initially, every traveler in the airport must submit to the same sort of questioning while not free to leave – reduces the likelihood that reasonable persons in that situation would consider themselves to be under arrest." *Id*. at 154. Thus, "*Miranda* warnings are not required in a routine secondary inspection when…a reasonable person would consider the questions asked…to be relevant to an admissibility or customs determination." *Id.* at 156 (Jacobs, J., concurring) (noting that all members of the panel agree with this holding); *see also United States v. Tavares,* No. 11-cr-610 (NGG), 2012 U.S. Dist. LEXIS 7327, at *4–5 (E.D.N.Y. Jan. 23, 2012).

5

Here, even taking his asserted facts as true, defendant has demonstrated nothing more than the conditions typical of a modern border inspection. While defendant was asked by a uniformed officer to step out of line into the secondary screening area and was certainly not free to leave, the restraints to which he was subjected were those attendant to the routine screening of *all* incoming international travelers. Indeed, as a traveler arriving at JFK Airport from abroad, the defendant "voluntarily submitted to some degree of confinement and restraint by approaching the border" and should reasonably have expected "some constraints as well as questions and follow-up" concerning his entry into the country. *FNU LNU*, 653 F.3d at 153.

Indeed, the totality of the circumstances that defendant describes would hardly suggest to the reasonable traveler in defendant's shoes that his restraints were comparable to those of a formal arrest. Though he notes that the officers were uniformed and armed, he does not allege that officers drew or brandished their weapons or used physical restraints, or that the encounter was lengthy, difficult or coercive in any way. *See id.* at 153–55. He was asked which bag was his, which is precisely the type of question a reasonable traveler would expect upon entry into the country. *See id*. at 154 ("a reasonable traveler will expect…questions and follow-up about his or her citizenship, authorization to enter the country, destination, baggage, and so on.")

To be sure, even in the border context, there can be exceptional circumstances that could give rise to custody for purposes of *Miranda*. *See id*. at 156 ("When the custodial conditions become clearly exceptional rather than routine—handcuffs, drawn weapons, administration of Sodium Pentothal, etc.—questions that objectively bear on admissibility might require a Miranda warning."). However, they are far from the circumstances at issue here.

For these reasons, defendant's motion to suppress the statements he made at the border is denied.

II. Post-Arrest Statements: Validity of Defendant's *Miranda* Waiver

Defendant also moves to suppress his statements made subsequent to his arrest on the grounds that he "did not understand the conversation as it was translated to him in Spanish," and that any waiver of his *Miranda* rights was not knowing and voluntary. (Def.'s Mot. to Suppress at 7; Def.'s Letter (Doc. No. 18) at 4.) The government argues that defendant knowingly and voluntarily waived his *Miranda* rights in Spanish. The Court finds the defendant's waiver to be knowing and voluntary.

"Once an accused is apprised of [his *Miranda*] rights, he may waive them provided the waiver is made voluntarily, knowingly and intelligently." *United States v. Richardson*, No. 09-cr-874, 2010 U.S. Dist. LEXIS 136004, at *10 (E.D.N.Y. Dec. 23, 2010) (internal quotation marks omitted) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). The government must prove that a defendant made a knowing and voluntary waiver of *Miranda* rights by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *United States v. Male Juvenile*, 121 F.3d 34, 39 (2d Cir. 1997).

Whether the waiver is valid is a two-part inquiry. *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011). First, the waiver must be "knowing," meaning that it "must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). Second, the waiver must be "voluntary," meaning that it must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* (quoting *Moran*, 475 U.S. at 421).

a. Defendant's *Miranda* Waiver Was Knowing

Language barriers are relevant to whether a waiver was knowing, but do not necessarily render a confession inadmissible. *Campaneria v. Reid*, 891 F.2d 1014, 1020 (2d Cir. 1989)

7

(holding that a defendant with "limited" English proficiency nonetheless made a valid *Miranda* waiver); *United States v. Santiago*, 720 F. Supp. 2d 245, 252 (W.D.N.Y. 2010) (citing *United States v. Boon San Chong*, 829 F.2d 1572, 1574 (11th Cir. 1987)). When the suspect is advised of his rights in a language that he understands, the waiver determination is "not difficult" as it would be, for example, if a non-English speaking defendant were administered *Miranda* warnings in English. *Santiago*, 720 F. Supp. 2d at 252. For a translated waiver to be "knowing," the translation need not be perfect as long as the suspect understands the substance of his rights. *United States v. Pablo Hernandez*, 93 F.3d 1493, 1501–02 (10th Cir. 1996).

One of the most important considerations in determining the validity of foreign-language *Miranda* waivers is defendant's conduct at the time the warnings are given. A defendant's indication at the time the warnings are given that he understands them and wants to speak to police is strong evidence of a knowing waiver. Even if the translation is not perfect or defendant's conduct initially suggests some confusion regarding his rights or hesitancy to speak, the waiver is still knowing as long as defendant ultimately confirms that he understands his rights and wants to talk. *See Pablo Hernandez*, 93 F.3d at 1501–02; *Perri v. Director, Dep't of Corr.*, 817 F.2d 448, 452 (7th Cir. 1987); *Santiago*, 720 F. Supp. 2d at 253; *United States v. Pena-Ontiveros*, 547 F. Supp. 2d 323, 337 (S.D.N.Y. 2008); *United States v. Munoz*, 748 F. Supp. 167, 169–71 (S.D.N.Y. 1990).

In addition, courts routinely consider the translator's qualifications when evaluating foreign-language *Miranda* waivers. *See, e.g., Perri*, 817 F.2d at 449, 453. The translator need not possess any specific qualifications, formal training as a translator, strong language skills, or even work for the police. *See Pablo Hernandez*, 93 F.3d at 1496–97 (upholding a Spanish-language waiver administered by the police officer's acquaintance, who had a third-grade

education, had no training as an interpreter, did not read either Spanish or English very well, and did not work for the police); *United States v. Zenon Hernandez*, 913 F.2d 1506, 1510 (10th Cir. 1990) (holding that the warning was adequate when the officer had another passenger in defendant's car, who had consumed three or four beers, translate warnings to defendant in Spanish); *Perri*, 817 F.2d at 449 (holding that the waiver was valid when administered in Italian by the chief of police, who had no formal training as a translator and learned Italian from his parents).

A waiver will be invalid when the officer's translation skills are so poor that the warning fails to inform the defendant of the substance of the rights he was waiving. *See Pena-Ontiveros*, 547 F. Supp. 2d at 337. For example, in *Pena-Ontiveros,* the court suppressed defendant's statements because the testimony at the suppression hearing "raised significant doubts" regarding whether the detective giving the *Miranda* warnings could accurately translate basic words on the waiver form. *Id.* In contrast, the court in *Pablo Hernandez* found valid the defendant's waiver under circumstances that were far from perfect. There, an officer asked defendant three times to read a written Spanish-language *Miranda* form, which she did not do. 93 F.3d at 1497. Defendant then was orally administered *Miranda* warnings in Spanish by a police officer's acquaintance who had a third-grade education, no training as an interpreter, had never acted as an interpreter, and did not read either Spanish or English very well. *Id.* The translation was "not perfect," and omitted the word "waive," instead asking "if, with [defendant's] rights, she was willing to answer questions." *Id.* Defendant responded with a question, and the officer explained "it's up to you whether or not you want to answer any questions." *Id.* Defendant then consented to answer questions. While noting that the translator's qualifications made the case more difficult, particularly in light of the more qualified interpreters readily available, the court

9

nonetheless held that defendant's waiver was knowing and voluntary. *Id.* at 1497 n.1, 1502–03. First, the court found that the warnings adequately apprised defendant of her rights though the translation was not perfect and omitted the word "waive." *Id.* at 1502. Second, the record clearly demonstrated that defendant understood her rights because she "repeatedly answered affirmatively when asked if she understood each right explained to her." *Id.* Moreover, defendant expressly stated that she wished to answer questions. *Id.* at 1503.

Here, the Court finds by a preponderance of the credible evidence that defendant was accurately apprised of all of his *Miranda* rights, and that he understood those rights and knowingly waived them. Officer Sanchez is a fluent Spanish speaker who not only uses the language at home but is certified and compensated to use the language as part of his job responsibilities, and regularly does so. The record clearly shows that the warnings he administered were complete and accurate, and that defendant understood the nature of his rights and the consequences of waiving them. Sanchez testified that he read all of the warnings verbatim from the *Miranda* card in Spanish. (Gov. Ex. 1; Tr. at 7:18–22; 8:15, 23–25; 9:2–6; 39:4–7.) Defendant confirmed that he understood and wished to waive his rights and talk to police. (Tr. at 10:7–10.) Defendant confirmed several times that he understood Officer Sanchez' Spanish. (Tr. at 12:2–8, 12:19–22, 32:2–9.) At the conclusion of the warnings, defendant confirmed that he understood his rights and wanted to waive them. (Tr. at 10:7–10.) Officer Sanchez further testified that defendant never indicated that he did not understand Sanchez' Spanish or did not understand his rights, and did not act confused in any other way. (Tr. at 42:13–22). [4]

---

[4] Defendant's failure to sign a written waiver form also does not make his waiver involuntary. *See North Carolina v. Butler*, 441 U.S. 369, 373 (1979) (holding that a written waiver is strong proof of the validity of the waiver, but is not necessary to waive); *United States v. Jin Kyoo Park*, 218 Fed. App'x 74, 75–76 (2d Cir. 2007) (holding that defendants' foreign-language Miranda waiver was valid even though they did not sign a written waiver form).

To show that the waiver was not knowingly made, defendant attempts to rely on a number of issues. Whether taken alone or in combination, his arguments fail.

First, defendant claims that Sanchez improperly modified the warnings by explaining – and not just reading − the operative question with regard to the waiver. While Officer Sanchez did use his own words to further explain the waiver of defendant's rights, his actions in no way invalidate the waiver. Sanchez testified that he first read directly from the *Miranda* card and then rephrased the final warning and request for waiver, explaining that "you have the right to forego or to let go of all of these rights and then make a statement, or you have a right to just stay there and be quiet and not say anything." (Tr. at 45:19–24.) This accurately informed defendant of the nature of the waiver, and properly left the choice of waiving up to the defendant. The circumstances here are analogous to those in *Pablo Hernandez*, where the court held that "[the officer's] explanation to [defendant] that she had the right to remain silent but could choose to speak to [the officer] if she wished was the equivalent of asking her if she waived her rights." 93 F.3d at 1503.

Next, defendant points to the fact that at the suppression hearing, when reciting the rights he read to the defendant, Officer Sanchez did not read into the record the right which accords the defendant counsel during or before questioning. (Tr. at 8:6–11.) However, as the transcript notes, this colloquy was interrupted by a defense objection. (*Id.*) Most important, Sanchez credibly testified that he read defendant each of the *Miranda* rights on the *Miranda* card. (Tr. at 8:10–11, 8:23–25.)

Third, defendant's challenge to Sanchez' qualifications also fails. No particular certification or qualifications are necessary for an interpreter, and the evidence presented clearly demonstrates Officer Sanchez' qualifications and ability to speak and translate Spanish,

11

including his fluency in the language from the time he was a child and the fact that he uses the language regularly both at home and at work. (Tr. at 10:13–21; 10:22–25; 11:1–12.) His qualifications are far better than those possessed by others who have successfully administered *Miranda* warnings. *See Pablo Hernandez*, 93 F.3d at 1496–97; *Zenon Hernandez*, 913 F.2d at 1510; *Perri*, 817 F.2d at 449.

Finally, Officer Sanchez' statement that some defendants might not understand the *Miranda* warnings as printed on the Spanish-language card is irrelevant to whether *this* defendant understood *his* rights. Simply put, as defendant's own conduct and responses show, defendant explicitly understood and waived those rights, and defendant never indicated in any way that he was confused or did not understand.

> b. Defendant's Waiver was Voluntary

In his supplemental submission, defendant argues, for the first time and without legal support, that his waiver was coerced on the sole ground that Officer Sanchez made the following statement:

> What I recall is just saying—what I recall is saying drugs were found in your possession. Whether you talk to us now or talk to us later, eventually the story is going to come out….Talk to us now, talk to us later, the story is going to come out. It's your choice. Do whatever you want. That's the gist of what I remember.

(Tr. at 36:9–12, 16–18.)

A waiver is voluntary as long as is it "the product of a free and deliberate choice rather than intimidation, coercion, or deception," *Moran*, 475 U.S. at 421, and not obtained under circumstances that overbear the defendant's will at the time it is given, *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991). In determining voluntariness, courts examine the

12

totality of the circumstances, including the conditions of the interrogation and the conduct of law enforcement officials. *United States v. Cohen*, 372 F. Supp. 2d 340, 359 (E.D.N.Y. 2005).

Here, defendant attempts to take some of Officer Sanchez's statements out of context. Moreover, nothing in the statements made by Officer Sanchez rendered involuntary defendant's waiver of his *Miranda* rights.

As Officer Sanchez testified, he further explained to defendant:

Like we tell all people in that situation, if they cooperate, it's easier for them, then if we go through this process, which obviously it's hard, by virtue of a year later we are still here. So it's obviously harder. . . .

We told him that it's easier if we know what the story is, because you know, maybe its not him, not his drugs, he was put up to it, you know. I remember him saying, you seem like a good man. He said he was some type of instructor, had a real job. I said things happen. Let me know what happened.

(Tr. 36:24-24 – 37: 1-5; 36:11-15).

Viewing all of Sanchez's statements in context, and under the totality of the circumstances, Officer Sanchez's statements did nothing more than point out that defendant was plainly found smuggling drugs into this country, and suggest to defendant that it would be beneficial for him to cooperate now as the circumstances surrounding defendant's criminal conduct would likely be discovered over time, all of which were true. *See United States v. Brooks*, 838 F. Supp. 58, 69 (W.D.N.Y. 1993) (finding waiver voluntary where officers told defendant "he was in a lot of trouble" and suggested that defendant should cooperate immediately). These are the types of statements that are routinely and properly used by law enforcement in an effort to gain the defendant's cooperation. *See, e.g., United States v. Bye*, 919 F.2d 6–7, 9–10 (2d Cir. 1990) (advising suspect of the benefits of cooperation held not coercive).

13

Defendant was not misled, tricked or cajoled into waiving his rights or speaking with the officers by Sanchez's comments, nor was his will overborne in any way. C*f.* *United States v. Anderson*, 929 F.2d 96 (2d Cir. 1991) (statements suppressed where misleading statements presenting defendant with a "now or never" choice contributed to the coercive atmosphere) (collecting cases). Indeed, Officer Sanchez made plain to defendant that it was solely defendant's choice as to whether to speak to the officers. (Tr. at 36:17 ("It's your choice. Do whatever you want.").) These are hardly circumstances that would render involuntary defendant's *Miranda* waiver.

## CONCLUSION

For the reasons stated herein, defendant's motion to suppress is denied in its entirety.

SO ORDERED.

Dated: Brooklyn, New York
       December 19, 2012

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge